FILED

PO JUL 28 PM 3: 37

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CALIFORNIA

1  BARRACK, RODOS & BACINE
   STEPHEN R. BASSER (121590)
2  sbasser@barrack.com
   JOHN L. HAEUSSLER (215044)
3  jhacussler@barrack.com
   One America Plaza
4  600 W. Broadway, Suite 900
   San Diego, CA  92101
5  Telephone:  (619) 230-0800
   Facsimile:  (619) 230-1874
6
   [Additional counsel listed on signature page]
7
   Attorneys for Plaintiff Lisa Laurian Downing
8

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

CV 08 3606

13 | LISA LAURIAN DOWNING, on behalf of    )  Case No.:
   | herself and all others similarly situated,  )
14 |                                       )  CLASS ACTION COMPLAINT FOR:
   |              Plaintiffs,              )
15 |                                       )  1. VIOLATION OF SECTION 1 OF THE
   |          vs.                          )     SHERMAN ACT;
16 |                                       )
   | FIDELITY NATIONAL FINANCIAL,          )  2. VIOLATION OF CAL. BUS. AND
17 | INC., FIDELITY NATIONAL TITLE         )     PROF. CODE § 16720, et. seq.;
   | INSURANCE COMPANY, TICOR TITLE        )
18 | INSURANCE COMPANY, TICOR TITLE        )  3. VIOLATION OF CAL. BUS. AND
   | INSURANCE COMPANY OF FLORIDA,         )     PROF. CODE § 17200, et seq.; and
19 | CHICAGO TITLE INSURANCE               )
   | COMPANY, NATIONAL TITLE               )  4. UNJUST ENRICHMENT
20 | INSURANCE OF NEW YORK, INC.,          )
   | SECURITY UNION TITLE INSURANCE        )
21 | COMPANY, THE FIRST AMEICAN            )
   | CORPORATION, FIRST AMERICAN           )
22 | TITLE INSURANCE COMPANY,              )
   | UNITED GENERAL TITLE INSURANCE        )
23 | COMPANY, LANDAMERICA                  )
   | FINANCIAL GROUP, INC.,                )
24 | COMMONWEALTH LAND TITLE               )
   | INSURANCE COMPANY, LAWYERS            )
25 | TITLE INSURANCE CORPORATION,          )
   | TRANSNATION TITLE INSURANCE           )
26 | COMPANY, STEWART TITLE                )
   | GUARANTY COMPANY and STEWART          )
27 | TITLE INSURANCE COMPANY               )
   |                                       )  JURY TRIAL DEMANDED
28 |              Defendants.              )
   |                                       )

CLASS ACTION COMPLAINT
59893

1    Plaintiff, Lisa Laurian Downing, by her attorneys, on behalf of herself and all others

2  similarly situated, brings this action for treble damages and injunctive relief under the antitrust

3  laws of the United States and based on statutes of the State of California against the above

4  named defendants, demand a trial by jury, and complains and alleges as follows:

5  **I.    INTRODUCTION**

6    1.    From the consumer's point of view, title insurance differs greatly from other,

7  more familiar kinds of insurance.  For one thing, while automobile and homeowner insurance

8  policies protect consumers from an event that may occur in the future, title insurance offers

9  protection from events that might have occurred in the past.

10    2.    Most simply, title insurance is protection purchased against a loss arising from

11  problems that occurred in the past and may affect the title to the real estate that a consumer is

12  buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.

13  In fact, almost all title policies are based on a single set of form policies published and

14  maintained by the national trade association, the American Land Title Association.

15  Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide

16  coverage for title defects that the search uncovers, but rather to exclude coverage for any such

17  defects and therefore, reduce the real value of the title policy which is written to cover only

18  unknown defects in title at the time of issuance.  As a result, title insurance is a commodity

19  product.

20    3.    Even for the savviest of insurance consumers, the purchase of a title insurance

21  policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

22  paperwork and signings that culminate in the closing of a home purchase.  Consumers who

23  normally shop around for their insurance and carefully compare prices, typically emerge from

24  the closing on their new home holding an insurance policy that they know virtually nothing

25  about and that in all likelihood, they will never need.

26    4.    The title insurance market in California consists of a dozen carriers, ranging in

27  size from regional companies to national affiliates.  However, the market is dominated by four

28  groups of affiliated companies which, combined, sell over 90 percent of the title insurance

1  policies sold in California and which own and control the title plants in many California
2  counties that every title insurer must rely on in order issue title policies.

3      5.      Title companies, in marked contrast to property, casualty, life and other
4  traditional insurance carriers, choose not to market their products directly to the consumers who
5  pay for them.  Instead, the title insurance industry operates on what is termed a "reverse
6  competition" model.  Reverse competition means that title companies solicit business referrals
7  from the other major players in the home purchase scenario — real estate agents and agencies,
8  banks, lenders, builders, developers and others: middlemen or go-betweens.    The title
9  companies pay middlemen for these referrals in the form of direct payments, advertising
10  expenses, junkets, parties and other kick-backs and inducements.  In addition, middlemen such
11  as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a significant
12  portion of the real estate brokerage market, take significant ownership stakes in local title agents
13  and affiliates of the major title insurers and thereby get a direct return in profit from the referral
14  of title business to the title agent whom they partly or wholly own.

15      6.      Reverse competition, as the term suggests, isn't a model that benefits consumers
16  through market-driven forces.  In fact, consumers are bypassed completely as title companies
17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks,
18  lenders, builders, developers and others in an effort to convince these middlemen to steer their
19  home-buying clients to their companies for their title insurance needs.

20      7.      In some of the major markets in the United States, these same title insurers
21  collectively meet, jointly set rates and file these rates with the applicable state insurance
22  authority.  The rates are not subject to any meaningful review or regulation.  The companies
23  agree to fix the price of title insurance far in excess of the risk and loss experience associated
24  with such insurance.  As a result of the joint agreement as to rates, competition is relegated to
25  the middleman.  As a result of their joint rate setting and agreement, no company competes on
26  price to the consumer.

27      8.      Having agreed to fix prices in states where joint rate setting occurs, the
28  companies agreed to not compete based on price to the consumer in other states, including

1    California, where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates

2    at super competitive prices and to compete based on offering inducements to middlemen. In

3    California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has

4    found an "astonishing number" of such inducements that are in violation of state law. However,

5    the OIC does not actively oversee rates, and, in fact, does not by its own admission have the

6    power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

7         9.     In addition to paying inducements and kick-backs, the title companies and their

8    agents divide the market of real-estate middlemen through the use of Affiliated Business

9    Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant

10    ownership stakes in favored title insurance affiliates. The real estate brokers then reward their

11    associates for using the preferred insurance providers and lock-out independent title insurers.

12        10.     In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13    California, seeks damages arising from defendants' violation of the Sherman Act as well as

14    California statutory law.

15    **II.**      **JURISDICTION AND VENUE**

16        11.     This Complaint is filed and these proceedings are instituted under Sections 4 and

17    16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to

18    obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable

19    attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the

20    Class which she represents by reason of defendants' and their co-conspirators' violations, as

21    hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1). As such, this Court has

22    jurisdiction pursuant to 28 U.S.C. §1331. This Court also has supplemental jurisdiction

23    pursuant to 28 U.S.C. §1367(a).

24        12.     Defendants transact business, maintain offices or are found within the Northern

25    District of California. The interstate commerce described hereinafter is carried on, in part,

26    within the Northern District of California and the conspiratorial acts herein alleged were carried

27    on, in part, in the Northern District of California. Plaintiff purchased her title insurance in

28    California.

III.    **PARTIES**

   **A.    Plaintiff**

   13.    Plaintiff, Lisa Laurian Downing, is an individual residing in San Diego, California. During the Class Period, plaintiff purchased title insurance directly from one or more of the defendants herein and has been injured by reason of the antitrust violations alleged.

   **B.    Defendants**

   14.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquarted at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company. Fidelity National is registered to do business in California.

   15.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

   16.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

   17.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave., Jacksonville Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

   18.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

1    32204.  Chicago Title does business in California, is a licensed title insurance company in
2    California and is registered to do business in California.

3         19.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York
4    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida
5    32204.  NTINY does business in California, is a licensed title insurance company in California
6    and is registered to do business in California.

7         20.    Defendant Security Union Title Insurance Company ("SUTIC") is a California
8    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida
9    32204.  SUTIC does business in California, is a licensed title insurance company in California
10   and is registered to do business in California.

11        21.    The Fidelity family of title insurance companies (collectively, "Fidelity") —
12   which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and
13   SUTIC, and their affiliates — is engaged in selling title insurance to purchasers of commercial
14   and residential real estate throughout the United States, including California.   Nationally,
15   Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to
16   roughly $4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA
17   (defined below) and since TIRSA's inception have charged title insurance rates in New York
18   that TIRSA collectively sets.

19        22.    The Fidelity family of title insurance companies and their affiliates are wholly-
20   owned and controlled by defendant Fidelity National Financial, Inc.  Through its subsidiaries,
21   Fidelity National is a provider of title insurance, specialty insurance, and claims management
22   services.  Fidelity National had 2006 revenues of roughly $9.4 billion.  The Fidelity family of
23   title insurance companies engaged in the conduct challenged herein with the approval and assent
24   of defendant Fidelity National.

25        23.    Defendant the First American Corporation ("First American") is a California
26   corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  First
27   American does business in California through one or more of its subsidiaries, including but not
28

1    limited to, defendants First American Title Insurance Company and United General Title
2    Insurance Company.

3        24.    Defendant First American Title Insurance Company ("FATIC") is a California
4    corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC
5    does business in California, is a licensed title insurance company in California and is registered
6    to do business in California.

7        25.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado
8    corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC
9    does business in California, is a licensed title insurance company in California and is registered
10   to do business in California.

11       26.    The First American family of title insurance companies (collectively, "First
12   American") — which included defendants First American, FATIC and UGTIC, and their
13   affiliates — is engaged in selling title insurance to purchasers of commercial and residential real
14   estate throughout the United States, including California. Nationally, First American accounts
15   for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8
16   billion. First American Title was a founding member of TIRSA and since TIRSA's inception
17   has charged title insurance rates in New York that TIRSA collectively sets.

18       27.    The First American family of title insurance companies and their affiliates are
19   wholly-owned and controlled by defendant The First American Corporation. Through its
20   subsidiaries, First American is a provider of title insurance, business information, and related
21   products and services. First American had 2006 revenues of roughly $8.5 billion. The First
22   American family of title insurance companies and their affiliates engaged in the conduct
23   challenged herein with the approval and assent of defendant First American.

24       28.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia
25   corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does
26   business in California through one or more of its subsidiaries, including but not limited to,
27   defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance
28   Corporation and Transnation Title Insurance Company.

1   29. Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

2 Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen,

3 Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

4 California and is registered to do business in California.

5   30. Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska

6 corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

7 LTIC does business in California, is a licensed title insurance company in California and is

8 registered to do business in California.

9   31. Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

10 corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

11 TNTIC does business in California, is a licensed title insurance company in California and is

12 registered to do business in California.

13   32. The LandAmerica family of title insurance companies (collectively

14 "LandAmerica") — which included defendants LandAmerica, CLTIC, LTIC and TNTIC, and

15 their affiliates — is engaged in selling title insurance to purchasers of commercial and

16 residential real estate throughout the United States, including California. Nationally,

17 LandAmerica accounts for approximately 19 percent of title premiums, which in 2006

18 amounted to roughly $3.15 billion. Commonwealth and Lawyers Title were founding members

19 of TIRSA and since TIRSA's inception have charged title insurance rates in New York that

20 TIRS collectively sets.

21   33. The LandAmerica family of title insurance companies and their affiliates are

22 wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. Through its

23 subsidiaries, LandAmerica is a provider of title insurance and other products and services that

24 facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

25 LandAmerica had 2006 revenues of roughly $4 billion. The Land America family of title

26 insurance companies and their affiliates engaged in the conduct challenged herein with the

27 approval of defendant LandAmerica.

28

1       34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

2   headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77069.  STGC does business

3   in California, is a licensed title insurance company in California and is registered to do business

4   in California.

5       35.    Defendant Stewart Title Insurance Company ("STIC") is a New York

6   corporation with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY

7   10017.  STIC does business in California, is a licensed title insurance company in California

8   and is registered to do business in California.

9       36.    The Stewart family of title insurance companies (collectively, "Stewart") —

10  which includes defendants STGC and STIC, and its affiliates — is engaged in selling title

11  insurance to purchasers of commercial and residential real estate throughout the United States

12  and California.  Nationally, Stewart accounts for approximately 12 percent of title premiums,

13  which in 2006 amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and

14  since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively

15  sets.

16      37.    Together, defendants account for more than 85 percent of the title premiums

17  consumers pay in California.  Nationally, they account for more than 85 percent of title

18  premiums, which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages

19  period, defendants charged California consumers in California virtually identical title insurance

20  rates.

21  **IV.**    **OTHER ENTITIES**

22      38.    TIRSA is a voluntary association of title insurers licensed as a rate service

23  organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains

24  its offices in New York City, which until recently were located at the same New York address

25  of Fidelity Title.

26      39.    TIRSA annually compiles from its members statistical data relating to their title

27  insurance premiums, losses and expenses and submits this information in aggregate form to the

28  New York Insurance Department.  TIRSA also prepares and submits the New York Title

1   Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by
2   TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has
3   collectively set.   Similarly, the California OIC has not actually held a public hearing or
4   conducted any other review or regulation of the title insurance rates in California for thirty
5   years.

6       40.    TIRSA's membership is comprised of defendant insurers and all other title
7   insurers that are licensed to issue policies in New York. Currently, Fidelity, First American,
8   LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they
9   comprise a majority voting block which, according to TIRSA's by-laws, allows them to control
10  the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

11      41.    Various other persons, firms and corporations not made defendants herein have
12  participated as co-conspirators with the defendants in the violations alleged herein and have
13  performed acts and made statements in furtherance thereof.

14  **V.    CLASS ACTION ALLEGATIONS**

15      42.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of
16  the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons
17  excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who
18  purchased directly, from one or more of the defendants and/or their co-conspirators title
19  insurance for residential and commercial property in California during the four year period
20  preceding this lawsuit and who have sustained damages as a result of the conspiracy herein
21  alleged. The number of potential Class members is so numerous that joinder is impracticable.

22      43.    Plaintiff, as a representative of the Class, will fairly and adequately protect the
23  interest of the Class members.   The interests of plaintiff are coincident with, and not
24  antagonistic to, those of the Class members.

25      44.    Except as to the amount of damages each member of the Class has by itself
26  sustained, all other questions of fact and law are common to the class, including but not limited
27  to, the combination and conspiracy hereinafter alleged, the violation of Section I of the Sherman
28  Act (15 U.S.C. § 1) and the effects of such violation.

1        45.    Plaintiff, along with all other members of the Rule (b)(3) Class, was injured as a

2    result of paying supracompetitive prices for title insurance in California.    These

3    supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities

4    and market allocation and division.

5        46.    Members of the Class include hundreds of thousands, if not millions, of

6    consumers. They are so numerous that their joinder would be impracticable.

7        47.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the

8    Federal Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9    The Rule (b)(2) Class included all members of the (b)(3) Class, and all consumers who are

10    threatened with injury by the anticompetitive conduct detailed herein.

11        48.    Defendants have acted, continued to act, refused to act and continued to refuse to

12    act on ground generally applicable to the Rule (b)(2) Class, thereby making appropriate final

13    injunctive relief with respect to the Rule (b)(2) Class as a whole.

14        49.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions,

15    of consumers. They are so numerous that their joinder would be impracticable.

16        50.    Common questions of law and fact exist with respect to all Class members and

17    predominate over any questions solely affecting individual Class members.    Among the

18    questions of law or fact common to the class are the following:

19        •    Whether defendants have engaged in the alleged illegal price-fixing
            activity and market allocation and division.

20
        •    The duration and scope of defendants' alleged illegal price-fixing and
21            market allocation and division activity.

22        •    Whether defendants' alleged illegal price-fixing and market allocation
            and division has caused higher prices to plaintiffs and other purchasers of
23            title insurance in California.

24        •    Whether the Insurance Commissioner has actively supervised defendants'
            price fixing and market allocation and division.

25        51.    Plaintiff does not have any conflict of interest with other Class members.

26    Plaintiff's claims are typical of the claims of the Class and she will fairly and adequately reflect

27    the interests of the Class.    Counsel competent and experienced in federal class action and

28    federal antitrust litigation has been retained to represent the class.

52. This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53. There will be no extraordinary difficulty in the management of the Class action.

## VI. TRADE AND COMMERCE

54. During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55. During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow of interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56. During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57. During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58. The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII. FACTUAL ALLEGATIONS

### A. The Nature of Title Insurance

59. Title insurance is one of the most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000 property) to $1,490 (for a $500,000 property). For more expensive homes and commercial properties, these prices are significantly higher. The amount spent on title insurance has risen dramatically over the past decade.

1    60.    Title insurance serves an important purpose. It protects the purchaser of a

2  property from any unidentified defects in the title that would in any way interfere with the full

3  and complete ownership and use of the property with the ultimate right to resell the property.

4  Title insurance is required by lenders in most residential and commercial real estate

5  transactions.

6    61.    Consumers exercise little discretion in choosing the title insurer from which they

7  purchase the insurance. That decision is typically made for them by their lawyer, mortgage

8  brokers, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not

9  challenged. Most consumers do not even become aware of the price they will pay and to which

10 insurer they will pay it until the actual closing of the real estate transaction. By then it's too late,

11 consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of

12 delaying or derailing the entire transaction.    There is no shopping around.    There is no

13 negotiation of price.

14    62.    This dynamic basically removes the sale of title insurance from the normal

15 competitive process and any real competitive constraints, unlike the regular forces of supply and

16 demand. The purchasers of the insurance, in most instances, are not the ones making the

17 purchasing decisions. And, they are certainly in no position to question the price.

18    63.    The most effective but illegal way for a particular title insurer to get business is

19 to encourage those making the purchasing decisions — the real-estate middlemen — to steer

20 business to that insurer. The best way to so motivate the middlemen is not through lower prices

21 (that they are not even paying). Rather is it through kickbacks in the form of finder's fees, gifts,

22 meals, business serviced and other financial enticements. Therefore, it is through higher pricing

23 (which allows for generous inducements and kick-backs), not lower pricing, that provides the

24 best way for title insurers to compete and increase their business.

25    **B.    Price-Fixing in the Large Markets**

26    64.    New York is one of the several states in which the leading title insurers

27 collectively fix their prices through a rate-setting organization like TIRSA. There are two

28

1   principal cost components that go into TIRSA's calculation. One comprises the risk associated
2   with issuing the title policy. The other comprises the "agency commission" paid to title agents.

3       65.    The risk component covers the risk the title insurer bears for any undiscovered
4   defects in the title. Unlike property insurance, title insurance carries with it a very limited risk
5   of loss to the insurer. That is because title insurance protects against unknown *prior* events that
6   cause defects in title. With a proper search and examination of prior ownership records, any
7   such defects can and almost always are readily identified and excluded from the policy's
8   coverage. Consequently, the average claim payout on a title insurance policy in the United
9   States amounts to only about 5 percent of the total premium collected. This is very different
10  from property coverage (such as auto and home insurance) — which protects against *future*
11  occurrences over which the insurer has little to no control — where the average claim payout
12  amounts to about 80 percent of the total premium.

13      66.    The "agency commissions" component of the title insurance rate covers
14  payments made to title agents. Defendants have an ownership or management stake in many of
15  the title agencies to which these payments are made. A small portion of the payments is for the
16  search and exam of prior ownership records of the property being purchased to identify any
17  liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam
18  function does not involve the spreading or underwriting of risk, and title insurers typically
19  outsource this task to title agents.

20      67.    The remainder, and by far the bulk, of the agency commissions are comprised of
21  costs unrelated to the issuance of title insurance. These costs include kickbacks and other
22  financial inducements title insurers provide to title agents and indirectly (through title agents) to
23  the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.
24  These payments have nothing to do with the issuance of title insurance and are made by the title
25  insurers merely to inflate their revenues and steer business their way.

26      68.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title
27  insurance premium is based on the so-called "costs" associated with the payment of agency
28  commission. Only 15 percent is based on costs associated with the risk of loss.

1    69.    TIRSA publishes its final calculated title rates in the New York Title Insurance

2  Rate Manual. These rates are tied to the value of the property being insured. This is so despite

3  the fact that the costs associated with agency commissions are entirely unrelated to the value of

4  the property. Indeed, agency kickbacks and enticements have little to do with producing a

5  particular title policy and provide no value — proportional to property value or otherwise — to

6  the consumer. Even search and exam costs are unrelated to property value. They instead

7  depend on the age of the property, the complexity of the ownership history, and the accessibility

8  of prior ownership records.

9    70.    There are other states in which the defendants overtly met and agreed to fix the

10  rates for title insurance as part of a formal collective rate setting process.

11    **C.    TIRSA's Formation**

12    71.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served

13  as the title insurance rate-setting body in New York. NYBTU, along with the title insurance

14  rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a

15  Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of

16  these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621

17  (1992), where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate

18  setting activity of these rating bureaus must be actively supervised by the state.

19    72.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

20  contended that the respective state insurance departments merely rubber-stamped this portion of

21  the collectively fixed rates without any independent review or analysis of their reasonableness

22  or cost justification. The Supreme Court agreed with the FTC that this kind of limited state

23  oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance

24  department has to "exercise[ ]sufficient independent judgment and control so that the details of

25  the rates or prices have been established as a product of deliberate state intervention, not simply

26  by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

27    73.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand

28  in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

1    collective rate-setting of certain state rating bureaus was improper because it was not actively
2    supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed
3    us that a state's rubber stamp is not enough. Active supervision requires the state regulatory
4    authorities' independent review and approval." *Id.* at 1139.

5        74.    Defendants formulated TIRSA's first rate manual and procedure soon after the
6    Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme
7    to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a
8    single rate that comprises both risk and agency commission costs and by outsourcing to title
9    agents the agency commission costs. In this way, defendants avoid providing the Insurance
10   Department with any detailed breakout or backup for the bulk of the costs that make up their
11   collectively fixed rates.

12       75.    TIRSA merely submits an aggregated figure that is supposed to represent the
13   total agency commission costs. Embedded with this figure is the vast quantity of dollars that are
14   funneled to and through the title agencies as kickbacks, financial inducements and other costs
15   unrelated to the issuance of title insurance. Defendants' design in all of this has been to
16   effectively "hide" the cost basis for their artificially high and collectively fixed title insurance
17   premiums from the regulatory scrutiny that *Ticor* demands.

18   **D.    Lack of Regulatory Supervision and Authority in New York and
           Other States Including California**

19

20       76.    There is no provision under the New York Insurance Law for TIRSA to include
21   in its collectively fixed rates kickbacks and other agency commission payments unrelated to the
22   issuance of title insurance.    Indeed, the New York Insurance Department has openly
23   acknowledged that it lacks the authority to review any agency commission payments. It has
24   likewise recognized that defendants' outsourcing of agency commission costs has prevented it
25   from performing a meaningful review of TIRSA's calculated rates. This was made clear at a
26   November 2006 public hearing the New York Insurance Department held — the first in 15
27   years — where it questioned TIRSA and its members on TIRSA's failure to provide the
     Insurance Department with any backup or detail for agency commissions.
28

1      77. At the hearing, the Insurance Department conceded that it could not properly
2    evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost
3    information on agency commissions that TIRSA does not provide.

4      78. The Insurance Department's recognition that it is not properly supervising
5    TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government
6    Accountability Office ("GAO") that the title insurance industry is in need of greater state
7    regulation. The GAO studied the industry conditions of several states, including New York, and
8    concluded that "state regulators have not collected the type of data, *primarily on title agents'*
9    *costs and operations*, needed to analyze premium prices and underlying costs." (Emphasis
10   added.)

11     79. Unchecked by regulatory review and insulated from competition, defendants
12   have thus been able to collectively fix title insurance rates at supracompetitive levels and earn
13   profits that vastly exceed those contemplated by the Insurance Department or that would have
14   resulted in a free and open competitive market.

15     80. At the time of TIRSA's formation, the Insurance Department established 5
16   percent (of the total premium) as the level of profit to which title insurers are entitled. The
17   Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in
18   particular, its revenue and cost information, to ensure that this 5 percent profit level is
19   maintained and based on a reasonable premium. However, without the authority or ability to
20   scrutinize agency commission costs, the Insurance Department has been unable to perform this
21   function. As a result, defendants (through TIRSA) have been able to set artificially high title
22   premiums and secure title profits far in excess of the 5 percent threshold.

23     81. Through an independent investigation conducted over the past several years, the
24   New York State Attorney General found that for every dollar of insurance premium defendants
25   collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is
26   paid out in claims. And, of the roughly 85 cents that supposedly covers agency commissions,
27   only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title

28

1    policy. These numbers show that title insurers' collectively fixed rates have resulted in profits

2    that are untethered to and vastly exceed the costs of producing such policies.

3        82.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants

5    were funneling to and through title agents to secure more business. As reported at the New

6    York Insurance Department's 2006 hearing, one title agency's financial statements revealed that

7    it spent more than $1 million of these so-called "agency commissions" on items identified as

8    "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

9    "travel and entertainment". These expenses are not even remotely related to the issuance of title

10   insurance.

11       83.    The Washington State Insurance Commissioner's October 2006 report found

12   strikingly similar abuses in Washington. Violations were pervasive and the Commissioner

13   concluded that consumers were paying too much as a result.

14       84.    All of this "excess money" paid to title agents not only works to steer business to

15   defendants, it also serves to boost defendants' own profits through the inflated revenues they

16   obtain to cover these agency payments and through their ownership or management stake in

17   many of these agencies.

18       85.    Defendants are competitors in the sale of title insurance to consumers throughout

19   the United States. These title insurers have agreed and engaged in concerted efforts to (i)

20   collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

21   their calculated rates agency commission costs, (iii) embed within these costs payoffs,

22   kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide

23   these supposed "costs" from regulatory scrutiny by funneling them to and through title agents

24   over which the government agencies have no ability or authority to regulate.

25       86.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of

26   the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

27   competition and questions about the reasonableness of prices including:

28

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have indentified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87.    The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to verse title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

88.    Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agree, either expressly or tacitly, to not compete on rates in other states

1    as well. To compete on rates in other states could and would imperil their ability to maintain

2    the agreed rate in states like New York.

3        90.    As in the case in New York, a lack of regulatory authority over rates created an

4    environment in which a conspiracy can and did succeed. No agency was examining why all the

5    rates were virtually identical, and no agency was examining whether the costs associated with

6    these premiums were reasonable. This is an environment which is conducive to price fixing.

7        91.    In California, there is a lack of regulatory authority and oversight over title

8    insurance companies. The rates in California are not set as part of a deliberate state intervention

9    and the state does not and cannot meaningfully renew or approve these rates. The rates at issue

10   in this case went into effect without review.

11   **F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

12

13       92.    In addition to the uniformity of rates, other facts suggest that is it more plausible than not that rates have been set based on an agreement to fix prices.

14

15       93.    In theory, the chain of title should be documented back to its historic grant of

16   ownership centuries in the past. Fear about a possible title defect in the distant past is widely

17   used as a justification by title agencies when convincing property buyers to purchase an owner

18   policy in addition to the lender policy, which is mandatory to secure a mortgage. The title

19   agency, however, saves much time and money when the search is limited to one or two

20   transactions. They rely on the insurance policy to cover the remote chance of missing an earlier

21   but still-valid claim. If such a claim is asserted and survives the scrutiny of the title insurance

22   company's legal department, the expected cost of compensation is likely to be less than the sum

23   of added overhead costs of routinely tracing back every chain of title to the earliest registered

24   owner in the distant past.

25       94.    Title insurance industry officials tend to justify the large proportion of the

26   premium retained by the title abstract and settlement agency (from 60 to more than 90 percent)

27   by the alleged high cost of title searching back into the distant past. In fact, a high proportion of

28   noncommercial properties are searched only through the most recent transaction. No

information is available as to what proportion of claims originate in the distant past. The

1  industry has never published pertinent statistics. It would have a marketing incentive to publish
2  these statistics if the risk were significant; that it has not published these statistics indicates that
3  the risk probably is only slightly greater than zero.

4        95.    Many U.S. homes have been resold three or four times in twenty-five years. At
5  each of these occasions, an abstract of title will be prepared on the basis of a more or less
6  thorough review of the available title records, inheritance records, family records and records of
7  past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a
8  title defect will decrease every time a property is sold.

9        96.    Title searches have become less labor intensive, especially in large urban
10  counties and cities. More and more of the information is available online. The statistical
11  likelihood that a title default would be overlooked is a closely held industry secret, but it
12  appears to be so small that many transactions are not insured on the basis of a search of the last
13  owner's title history or a search into transactions that occurred during the last twenty-five to
14  thirty-five years. The evidence is strong that the title insurance industry has achieved a
15  remarkably high level of loss minimization.

16       97.    Thus the costs of production have decreased as has the risk of loss yet none of
17  these factors has resulted in price competition at the consumer level.

18       98.    There is remarkable absence of rate changes by title insurers over the past five
19  years, despite declining costs of production, increased number of transactions and increased
20  revenue per transaction. During a period when costs per unit of production declined
21  significantly, underwritten title companies and title insurers maintained excessive rates. The
22  prices charged by title insurers and underwritten title companies were not and are not responsive
23  to the changing costs of production or increasing revenue per transaction at a given set of rates.
24  Again, this is indicia of an agreement not to compete based on price.

25       99.    As noted, the title companies engage in illegal rebates and kickbacks where the
26  title insurer or the underwritten title company provides money, free services or other things of
27  value to a real estate agent, a lender or homebuilder in exchange for business referrals. These
28  illegal rebates and kickbacks — a consequence of reverse competition — show that title

1  insurance rates are supra competitive and that some portion of the overcharge is passed from the
2  underwritten title company or title insurer to the referrer of business.

3      100.   A lack of competition and the ability to control prices is enhanced by the fact that
4  there were few title insurer entrants over the period from 1995 through 2005 and the number of
5  title insurer groups declined as title insurers acquired other title insurers.  There were few
6  underwritten title company entrants over the 2000 to 2005 period and new entrants were
7  controlled business arrangements whose addition to the market did not result in greater price
8  competition.

9      101.   Access to title plants can be a barrier to entry, but a larger barrier to entry exists
10  due to the established relationships between the entities that can steer the consumer's title and
11  escrow business and the entities who sell title insurance and escrow services.

12      102.   The title insurance market is highly concentrated — a few title insurers account
13  for the vast majority of title insurance sales — at both the statewide level and at the county level
14  in California.  For example, three title insurer groups account for 77.4% of the market at a
15  statewide level.  At the county level, each individual market was highly concentrated.  The
16  GAO found that First American and Fidelity had a market share of 66 percent.  Such a
17  concentration enhances the ability of companies to fix prices.

18      103.   The agreement not to compete based on price is also evidenced by the fact that
19  no company has marketed its services to consumers, the ultimate purchasers of the product.
20  This is in marked contrast to real insurance, for example, car insurance, where the companies
21  compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor,"
22  or Allstate's "good hands,' or the cute (to some) GEICO gecko promising low prices.

23  **VIII.  CLAIMS FOR RELIEF**

24                                      **COUNT I**

25                            **Violation of the Sherman Act**

26      104.   Plaintiff incorporates by reference the preceding allegations.

27      105.   Beginning at least as early as July 2004, and continuing thereafter to the present,
28  the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a

1   combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and
2   commerce in violation of Section 1 of the Sherman Act.

3       106.    The aforesaid combination and conspiracy has consisted of a continuing
4   agreement, understanding and concert of action among the defendants and their co-conspirators,
5   the substantial terms of which have been:

6           (a)    to fix, raise, maintain and stabilize the price of title insurance throughout
7   California;

8           (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title
9   insurance in California; and

10          (c)    to allocate and divide the market for title insurance in California.

11      107.    In the absence of proper regulatory authority and oversight, defendants' conduct
12  constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to
13  allocate and divide the title insurance market in California and is a *per se* violation of Section 1
14  of the Sherman Act.

15      108.    Defendants' price-fixing, market allocation and division activity has been
16  continuous throughout the relevant damages period and has been renewed and reinforced
17  annually through submissions to the OIC of supposed cost and revenue information and its
18  periodic submissions of rate changes.

19      109.    Through their collective price-fixing, market allocation and division and
20  manipulation of the regulatory process, defendants have harmed competition by charging
21  consumers supra competitive prices for title insurance in California, evidenced in part by the
22  fact that the prices are uniformly higher than compared with the cost of providing the insurance.

23      110.    The aforesaid combination and conspiracy has had the following effects among
24  others:

25          (a)    price competition in the sale of title insurance has been suppressed,
26  restrained and eliminated;

27          (b)    prices for title insurance have been raised, fixed, maintained and
28  stabilized at artificially high and non-competitive levels; and

1     (c)    purchasers of title insurance have been deprived of the benefit of free and

2   open competition.

3     111.    During the period of the antitrust violations by defendants and their co-

4   conspirators, plaintiff and each member of the Class she represents, have purchased title

5   insurance and, by reason of the antitrust violations herein alleged, paid more for such than they

6   would have paid in the absence of said antitrust violations.  As a result, plaintiff and each

7   member of the Class she represents have been injured and damaged in an amount presently

8   undetermined.

9                                   **COUNT II**

10                    **Violation of Cal. Bus. and Prof. Code § 16720, *et seq.***

11     112.    Plaintiff incorporates by reference the preceding allegations.

12     113.    Defendants' conduct as set forth above is in violation of the Cartwright Act of

13   California (Cal. Bus. & Prof. Code § 16720, *et seq.*).

14     114.    As a direct result of defendants' unlawful acts plaintiff has paid artificially

15   inflated prices for title insurance and has suffered injury to her business and property.

16                                   **COUNT III**

17                    **Violation of Cal. Bus. And Prof. Code § 17200, *et seq.***

18     115.    The preceding paragraphs of this Complaint are realleged and incorporated by

19   reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Cod §

20   17200, *et seq.*, on behalf of herself and the members of the Class.

21     116.    Defendants' statements and representations constitute unfair, unlawful and

22   deceptive trade practices in violation of the UCL.

23     117.    All of the wrongful conduct alleged herein occurs and continues to occur in the

24   conduct of defendants' business. Defendants' wrongful conduct is part of a pattern or

25   generalized course of conduct that is repeated in the State of California on hundreds, if not

26   thousands, of occasions daily.

27

28

1    118.    Plaintiff has suffered injury in fact and has lost money or property as a result of

2  defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title

3  insurance than she would or should have absent the conduct complained of.

4    119.    Plaintiff requests that this Court enter such orders or judgment as may be

5  necessary to enjoin the defendants from continuing their unfair, unlawful, and/or deceptive

6  practices, to restore to any person in interest any money which may have been acquired by

7  means of such unfair competition and to disgorge any profits realized by defendants as a result

8  of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203

9  and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

10                                           **COUNT IV**

11                                       **Unjust Enrichment**

12    120.    Plaintiff incorporates by reference the preceding allegations.

13    121.    This Cause of Action is pled in the alternative to all claims and/or causes of

14  action at law.

15    122.    Defendants have received a benefit from plaintiff and the Class members in the

16  form of the prices plaintiff and the Class members paid for defendants' title insurance.

17    123.    Defendants are aware of their receipt of the above-described benefit.

18    124.    Defendants received the above-described benefit to the detriment of plaintiff and

19  each of the other members of the Class.

20    125.    Defendants continue to retain the above-described benefit to the detriment of

21  plaintiff and the Class members.

22    126.    As a result of defendants' unjust enrichment, plaintiff and the Class members

23  have sustained damages in an amount to be determined at trial and seek full disgorgement and

24  restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the

25  unlawful or wrongful conduct alleged above.

26                                       **PRAYER FOR RELIEF**

27    WHEREFORE, plaintiff demands:

28

1      A.     That the alleged combination and conspiracy among the defendants and their co-

2  conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

3  Section 1 of the Sherman Act;

4      B.     That the Court declare that the premiums charged are excessive under state law

5  and order damages;

6      C.     That judgment be entered against defendants, jointly and severally, and in favor

7  of plaintiff, and each member of the Class she represents, for threefold the damages determined

8  to have been sustained by plaintiff, and each member of the Class she represents, together with

9  the cost of suit, including a reasonable attorneys' fee;

10      D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and

11  their respective officers, directors, agents and employees, and all other persons acting or

12  claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained

13  from, in any matter, directly or indirectly, continuing, maintaining or renewing the aforesaid

14  combination, conspiracy, agreement, understanding or concert of action, adopting or following

15  any practice, plan, program, or design having a similar purpose or effect in restraining

16  competition; and

17      E.     Such other and further relief as may appear necessary and appropriate.

18                   **JURY TRIAL DEMAND**

19      Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

20  DATED: July 25, 2008           BARRACK, RODOS & BACINE

                              STEPHEN R. BASSER

21                             JOHN L. HAEUSSLER

22

23

                           STEPHEN R. BASSER

24

25                             One America Plaza

                           600 W. Broadway, Suite 900

26                             San Diego, CA 92101

                           Telephone: (619) 230-0800

27                             Facsimile: (619) 230-1874

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARRACK, RODOS & BACINE
GERALD J. RODOS
JEFFREY GITTLEMAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Attorneys for Plaintiff Lisa Laurian Downing